UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

DONALD COLBERT,

                         Petitioner,

        -against-

ERIC SCHNEIDERMAN,

                         Respondent.

-----------------------------------------------------------------X

15-CV-05961 (VEC)(SN)

**REPORT AND RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE VALERIE E. CAPRONI:**

     Donald Colbert, pro se, petitions under 28 U.S.C. § 2254 for a writ of habeas corpus vacating his May 26, 2011 conviction of first-degree manslaughter. In the early morning of December 25, 2008, Colbert and Dennis Bates assaulted Pedro Torres and stabbed him with a sharp instrument, resulting in his death. Colbert raises the following claims in his § 2254 petition: (i) his sentence of twenty years' imprisonment and five years' post-release supervision was excessive and harsh; (ii) his conviction was based on insufficient evidence; and (iii) he was deprived of his due process rights when the state trial court declined to charge the lesser-included offenses of second-degree manslaughter and criminally negligent homicide.

     Colbert's petition should be denied. His claim for excessive sentence is unexhausted because he failed to present the federal nature of his claims in state court. His claim of deprivation of due process stemming from the state court's rejection of his request to charge lesser-included offenses is non-cognizable because the Supreme Court has not recognized a constitutional right to the inclusion of lesser-included offenses in non-capital cases. Finally,

Colbert's claim of insufficient evidence is without merit because when viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that all of the necessary elements of the crime of first-degree manslaughter were satisfied.

## BACKGROUND

### I. The Crime

Shortly after midnight on December 25, 2008, a fight broke out between Donald Colbert and Dennis Bates, and Pedro Torres. The three men were riding an elevator together in an apartment building at 5210 Broadway in the Bronx when Colbert and Torres started an argument that quickly became physical. Bates joined the fight on the side of his friend, Colbert, and the fight spilled into the stairwell on the eleventh floor. At some point, someone stabbed Torres with a sharp object, resulting in the perforation of his pulmonary vein. When Colbert and Bates realized that Torres was no longer fighting back, they fled. They were apprehended by police in the building's lobby and immediately arrested. The police found Torres, covered in blood, walking down the stairs between the tenth and eleventh floors. He was pronounced dead at the hospital a few hours later.

On January 12, 2009, the grand jury returned an indictment charging Colbert and Bates with second-degree intentional murder, second-degree felony murder, first-degree manslaughter, two counts of first-degree robbery, and second-degree robbery.

### II. The Trial and Procedural History

#### A. The Prosecution's Case

At trial, the prosecution presented written and videotaped statements that Colbert gave on December 25, 2008. Detective Sean O'Leary read into evidence the contents of Colbert's written statement. He wrote that on December 24, 2008, he had been drinking beer with his friend Bates.

The two men then entered an apartment building at 5210 Broadway and got in an elevator with Torres. In the elevator, Colbert and Torres began arguing and started "tussling." (T. 464.) When the fight moved into the stairwell, Colbert stated that he was punching Torres, and Bates was "pushing and punching." Id. Colbert wrote that when he noticed Torres had stopped fighting back, he told Bates "let's go" and they both fled to the building's lobby. Id.

Detective O'Leary also testified that he had videotaped Colbert's interview with Assistant District Attorney Amy Weisswasser. In the videotape, which was played for the jury, Colbert stated that he and Torres had an argument in the elevator and then started pushing each other. He said they exited the elevator and moved into the stairwell, where Colbert was "hitting him, hitting him, Dennis [Bates] was also hitting him, and we were all bouncing back and forth in the staircase, and came to a point where I see he wasn't putting up a fight anymore, so I told my friend Dennis let's go." Resp't's Decl. Ex. 2 at 11.[1] Colbert stated that he hit Torres a total of eight to ten times and pushed him up against the wall "numerous" times. Id. He told ADA Weisswasser there was a lot of blood after the assault and that the blood on his clothes belonged to Torres.

Barbara Jamison, a fifty-five-year-old woman who lived on the eleventh floor of 5210 Broadway, testified that around 12:20 a.m. on December 25, 2008, she heard knocking and banging in the stairway, causing her to exit her apartment and look through the window of the stairway door. She stated that she saw a man in a green jacket standing by the doorway and a man in a black jacket leaning down over a third person who was lying on the ground. Ms. Jamison said that she could see only the face of the man in the black jacket, whom she

---

[1] Colbert's videotaped confession from December 25, 2008, was not provided to the Court in connection with Colbert's habeas petition. All quotations and citations to the video are taken from the memorandum of law in opposition to Donald Colbert's appeal of his conviction to the Appellate Division, First Department, submitted by the District Attorney's Office for Bronx County.

recognized as the son of a woman who worked at the local community center. She said that she saw the man in the black jacket repeatedly hit the person on the ground and bang his head against the stairs. Ms. Jamison testified that the man on the ground said "Let me go, you don't have to do this. You could have whatever I got or whatever I have" and then one of the two other men told him to "shut up." (T. 186.) Ms. Jamison testified that after observing the fight for about a minute, she ran back to her apartment and called the police. After making the call, she said that she returned to the hallway with her telephone in hand. She called the police a second time and then slammed her door, hoping to alert the attackers of her presence. Shortly thereafter, the man in the green jacket, whom Ms. Jamison recognized as Colbert, emerged from the stairwell carrying a white shopping bag. Ms. Jamison said that she knew Colbert because his family had previously lived on the same floor of the apartment building. She stated that she had seen him earlier that day standing in front of the building and could tell that he had been drinking, although she testified that she had never actually seen him consume alcohol. Ms. Jamison stated that as Colbert walked past her, he said "oh, so that was you?" (T. 192.) and told her that he had been robbed. He then proceeded around the corner of the hallway, out of sight from Ms. Jamison. Then Bates also exited the stairwell. As he walked past Ms. Jamison, she asked him "so it's you too?" (T. 197.) She testified that in response, Bates lifted a blood-covered hand. He then proceeded down the hallway in the same direction as Colbert.

   Ms. Jamison testified that after both men had walked out of sight, she went to the stairwell and saw Torres walking down the steps from the eleventh to the tenth floor. She said that she called out to him, but he did not respond. Ms. Jamison saw blood, but was unable to determine the extent of Torres's injuries. Around the same time, the police arrived. Ms. Jamison testified that she told the police that she had seen two men—one in a green jacket and the other

in a black jacket—trying to rob Torres. Soon thereafter, an officer led Ms. Jamison to the first-floor lobby, where Colbert and Bates were being detained by the police. She identified them as the men she had seen attack Torres in the stairwell.

Around 12:20 a.m. on December 25, 2008, Police Officers Jose Gomera, James McGee, Roland Benson, Pivatchai Jetmalong, and Sergeant Brian Lopez responded to a radio call of a robbery in progress at 5210 Broadway. Officer Gomera testified that he and Officer McGee took the elevator to the twelfth floor. While riding the elevator, they heard "numerous bangs . . . like something was being banged against a wall or . . . the ground floor in the vicinity around the elevator." (T. 242.) Officer Gomera testified that after he and Officer McGee arrived on the twelfth floor, they proceeded down the stairs, where they encountered Ms. Jamison standing by the door to the eleventh floor stairwell. Officer Gomera testified that he saw Torres on the stairs between the tenth and eleventh floors. He said that Torres appeared to be limping, so Officer Gomera helped him walk down to the tenth floor landing. He noted that there was "blood everywhere" and shattered glass on the floor. (T. 243.) After Torres sat down on one of the steps, Officer Gomera noticed that he was bleeding from his mouth and face, so he applied pressure to the left side of Torres's face. He directed Officer McGee, who had been questioning Ms. Jamison, to call an ambulance. Officer Gomera stated that he remained with Torres until EMS arrived at the scene and transported him to the hospital.

While Officers Gomera and McGee investigated the eleventh floor stairwell, Sergeant Lopez and Officer Benson waited in the lobby area. Sergeant Lopez testified that he saw the arm of a man wearing a green jacket extend out from the doorway to one of the stairwells. He noticed that the hand and arm were splattered with blood. Sergeant Lopez stated that he grabbed the arm and drew his weapon. Sergeant Lopez and Officer Benson placed Colbert against the wall and

handcuffed him. While Sergeant Lopez detained Colbert, Officer Benson proceeded to the other stairwell where he saw Bates slowly descending the stairs. He yelled out a warning and then walked toward him on the stairs. Officer Benson testified that he then handcuffed Bates and brought him to the lobby.

Dr. Margaret Prial, the Medical Examiner who performed the autopsy on Torres, testified that he had been stabbed by a "sharp instrument or knife" that had cut through his cheek and neck and into his jugular vein, causing his death. (T. 511.) She said that Torres also had incision wounds near his left eyebrow and his right cheek and ear, as well as bruising and contusions on other areas of his face. Dr. Prial stated that she identified "blunt impact injuries" on Torres's head, torso and extremities. (T. 512.) She testified that his injuries were consistent with punching, kicking or being struck against a hard object such as a wall or stair.

Christopher Kamnik, a supervisor in the Office of the Chief Medical Examiner, Department of Forensic Biology, testified that blood stains on the green jacket that Colbert wore the night of the attack were a positive DNA match for Torres and Bates. Mr. Kamnik testified that Torres's blood was also found on Colbert's shoes and jeans.

**B.  The Defense's Motion to Dismiss**

After the close of the prosecution's case, Colbert's counsel moved for an order of dismissal with respect to all counts of the indictment, on the ground that the People had failed to present sufficient evidence to support any of the charges. In respect to the charge of murder in the second degree, counsel argued that the People had failed to present any evidence that Colbert used a weapon to kill Torres, or that he was acting in concert with Bates when Bates was slamming Torres's head into the ground, possibly causing lacerations to his face by hitting it against broken glass. Defense counsel also argued that the People had failed to prove a *prima*

6

*facie* case of felony murder because the prosecution had not presented evidence that Colbert was robbing or attempting to rob Torres. He argued that there was insufficient evidence to support a conviction for first-degree manslaughter because there was no evidence that Colbert had stabbed Torres with a sharp object or otherwise caused his death. Likewise, defense counsel argued that the prosecution had failed to present sufficient evidence to support a conviction for causing serious physical injury or forcibly removing property with a weapon.

The trial court expressed skepticism about the evidence of robbery and granted the defendant's motion in part by refusing to submit the robbery counts to the jury. The court denied the motion as to intentional murder and manslaughter.

The defense presented no witnesses. Following summations, defense counsel renewed the motion to dismiss the charges on the grounds of insufficient evidence. The court denied the motion.

### C. The Charge Conference

At the charge conference, Colbert's counsel requested that the court include second-degree manslaughter, criminally negligent homicide and third-degree assault as lesser-included offenses of second-degree murder and first-degree manslaughter. Defense counsel argued that evidence Colbert had been drinking throughout the day supported a finding that his intoxication caused him to act recklessly, and not intentionally. In the alternative, counsel argued that the jury could find that, notwithstanding his level of intoxication, the evidence did not support a finding that Colbert intended to kill Torres, but rather that he acted recklessly when he repeatedly punched Torres, threw him against the wall, and knocked him down into an area that was covered in broken glass. In support of the charge of assault in the third degree, defense counsel argued that the jury could find that Colbert did not cause Torres's death, but that he did commit

the crime of assault. The trial court found that there was insufficient evidence of intoxication or lack of intent to support the inclusion of second-degree manslaughter and negligent homicide as lesser-included offenses.

### D. The Verdict and Sentencing

The following charges were presented to the jury: one count of felony murder, and one count of murder in the second degree, with first-degree manslaughter and third-degree assault as lesser-included offenses. The jury found Colbert guilty of manslaughter in the first degree, under Penal Law § 125.20(1). The court sentenced Colbert to 20 years in prison, with five years of post-release supervision.

## III. Post-conviction Procedural History

### A. State Proceedings

Colbert's counseled appeal brief raised three issues: (i) there was insufficient evidence to support a conviction of first-degree manslaughter, or, in the alternative, his conviction was against the weight of evidence; (ii) the court deprived him of his due process and statutory rights by refusing to charge second-degree manslaughter and criminally negligent homicide as lesser-included offenses of first-degree manslaughter; and (iii) a twenty-year sentence for Colbert, a first-time felony offender, was excessively harsh and should be reduced.

The Appellate Division affirmed the judgment, finding that "the evidence overwhelmingly supports the jury's determination that the defendant acted with the requisite intent to cause serious physical injury to the decedent." Colbert, 123 A.D.3d at 513. The court held that the trial court had properly refused to submit to the jury the lesser-included offenses of second-degree manslaughter and negligent homicide, explaining that there was "no reasonable view of the evidence that defendant was intoxicated to the point that he was unable to form the

intent to cause serious physical injury," "[n]or is there a reasonable view of the evidence that he acted intentionally as to the attack on the decedent but negligently or recklessly as to the risk of death." Id. The court also found no basis to reduce Colbert's sentence.

On December 12, 2014, Colbert sought leave to appeal from the Court of Appeals. A judge of that court denied his motion on May 6, 2015. People v. Colbert, 25 N.Y. 3d 1071 (2015).

### B. The § 2254 Petition

On July 27, 2015, Colbert, pro se, filed his § 2254 petition in the U.S. District Court for the Northern District of New York. His habeas petition was transferred to the U.S. District Court for the Southern District of New York on July 30, 2015. Colbert raises three grounds for relief: (i) his sentence was excessive and harsh, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment; (ii) the evidence was insufficient to support his conviction because the People failed to prove that he held the requisite *mens rea* to cause serious physical injury and death to the victim; and (iii) he was deprived of his due process rights when the trial court refused to charge second-degree manslaughter and criminally negligent homicide as lesser-included offenses of first-degree manslaughter.

In opposition to Colbert's habeas petition, respondent argues that Colbert's excessive sentence claim is unexhausted and therefore unreviewable in a federal habeas petition, that there was "overwhelming" evidence to support a conviction of first-degree manslaughter, and that Colbert's argument regarding the trial court's failure to include lesser-included offenses is non-cognizable on federal habeas review.

**DISCUSSION**

**I.    Jurisdiction and Timeliness**

The Antiterrorism and Effective Death Penalty Act (the "AEDPA") requires a state prisoner whose conviction has become final to seek federal habeas corpus relief within one year. 28 U.S.C. § 2244(d)(1)(A). This one-year period serves the "well-recognized interest in the finality of state court judgments." Duncan v. Walker, 533 U.S. 167, 179 (2001). A petitioner's judgment becomes final 90 days from the date the New York State Court of Appeals denies leave to appeal—*i.e.*, after the "period to petition for a writ of *certiorari* to the United States Supreme Court." Pratt v. Greiner, 306 F.3d 1190, 1195 n.1 (2d Cir. 2002).

It is uncontested that Colbert's habeas petition is timely filed. A judge of the New York Court of Appeals denied Colbert leave to appeal on May 6, 2015, and his conviction became final 90 days later, or on August 4, 2015. Colbert had one year to file his habeas petition, or until August 4, 2016. Accordingly, Colbert's petition, placed in the prison mail on July 24, 2015, is timely.

**II.   Exhaustion**

    **A. Statement of Law**

The respondent argues that Colbert has failed to exhaust his excessive sentence claim because, on appeal, he did not assert any federal constitutional claims pertaining to this issue. Before a federal court can review a petition for a writ of habeas corpus, a petitioner must exhaust all state-provided remedies. 28 U.S.C. § 2254(b)(1)(A). See also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (stating that, to exhaust a claim, a petitioner must "invoke[] one complete round of the State's established appellate review process" before bringing the same claim in federal court). A claim is deemed exhausted if the petitioner: (i) "fairly presented" to an

10

appropriate state court the same federal constitutional claim that he now urges upon the federal courts; and (ii) presented his claim to the highest state court that could hear it. Baldwin v. Reese, 541 U.S. 27, 29 (2004); O'Sullivan, 526 U.S. at 844–48.

To fairly present his claims, a petitioner may not rely solely on general principles of fairness, but instead must refer to specific constitutional provisions or concepts. See Reid v. Senkowski, 961 F.2d 374, 376 (2d Cir. 1992) (stating that minimal reference to the Constitution satisfies the exhaustion requirement); see also de la Cruz v. Kelly, 648 F. Supp. 884, 888 (S.D.N.Y. 1986) (finding that the petitioner sufficiently alerted the state court of the constitutional aspect of his claims when he argued that the challenged ruling denied him a fair trial and cited the Fourteenth Amendment). The legal doctrine asserted in the state courts does not need to be identical to that raised in the habeas petition, but "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." Daye v. Att'y Gen. of New York, 696 F.2d 186, 192 (2d Cir. 1982).

The Court of Appeals applies the "fair presentation" standard liberally, allowing that a state court may be deemed to be on notice of the constitutional nature of a claim even if the petitioner did not specifically quote the U.S. Constitution. Other ways that a petitioner may be found to have provided notice sufficiently include "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Ramirez v. Att'y Gen. of New York, 280 F.3d 87, 95 (2d Cir. 2001) (citing Daye, 696 F.2d at 194). This position protects petitioners who rely on constitutional principles without citing "book and verse on the federal constitution," while

ensuring that state courts have the opportunity to "pass upon and correct" alleged violations of federal rights. Picard v. Connor, 404 U.S. 270, 275, 278 (1971) (internal quotation marks and citations omitted).

### B. Analysis

Colbert's Eight Amendment excessive sentence claim is unexhausted because the constitutional nature of the claim was not fairly presented on appeal to the state courts. As a general rule, "a prisoner's reliance on a state procedural law granting courts discretionary authority to reduce sentences does not 'fairly present' his/her constitutional claim in the state court." King v. Cunningham, 442 F. Supp. 2d 171, 181 (S.D.N.Y. 2006) (citing Acosta v. Giambruno, 326 F. Supp. 2d 513, 521–22 (S.D.N.Y. 2004); Grant v. Berbary, 99 Civ. 12017 (LAK) (THK), 2002 WL 33985139, at *3 (S.D.N.Y. Jan. 22, 2002); Castillo v. Abrams, 88 Civ. 1165 (MGC), 1988 WL 96026, at *2 (S.D.N.Y. Aug. 24, 1988)). In his brief, Colbert argued that the Appellate Division should exercise its discretionary and plenary powers to modify his sentence in the interest of justice under CPL § 470.15(3)(c). He neither cited federal case law, nor did he apply a constitutional analysis to any of his claims. Furthermore, Colbert failed to allege a pattern of facts that were "well within the mainstream of constitutional litigation." Instead, he relied on state law precedent to argue that the fact pattern in this case justified a reduction of his sentence. Because Colbert failed to litigate a federal constitutional claim in his state law appeal, his excessive sentence claim should be deemed unexhausted and therefore DENIED.

Even if the Court could reach the merits, this claim should be denied. Colbert does not claim that his sentence was outside the range prescribed by state law and therefore no constitutional challenge lies. See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992).

**III.     Merits Claims**

    **A.  Standard of Review**

After exhaustion, but before a federal court can issue a writ of habeas corpus, a petitioner must satisfy a "difficult to meet . . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 171 (2011) (internal quotation marks and citations omitted). Under the AEDPA, habeas relief may be granted only when the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court 'applied a rule that contradicts' that precedent, or reached a different result than the Supreme Court on facts that are 'materially indistinguishable.'" Mannix v. Phillips, 619 F.3d 187, 195 (2d Cir. 2010) (internal alterations omitted) (quoting Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). As long as the state court decision applied the correct legal rule to the facts of a petitioner's case, it is not subject to habeas review, even if the federal court would have reached a different conclusion if it were to apply the rule itself. Williams, 529 U.S. at 406.

A state court's decision involves an "unreasonable application" of clearly established federal law if the court identified the legal rule set forth in governing Supreme Court cases, but unreasonably applied the rule to the facts of the case. Id. at 407–08. A federal court may grant habeas relief only when the state court's decision, as it pertains to any issue of federal law, was

13

"objectively unreasonable" in light of relevant precedent. Thus, in construing and applying federal law, even erroneous state court decisions that are deemed reasonable will survive habeas review. Id. at 409–13. For federal habeas review, factual determinations made by a state court are presumed correct, and a petitioner bears the burden of rebutting this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Where a petitioner proceeds pro se in the habeas context, the Court must construe his arguments "liberally and interpret them to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citation omitted). See Williams v. Breslin, 274 F. Supp. 2d 421, 425 (S.D.N.Y. 2003).

### B. Sufficiency of the Evidence

In reviewing a habeas challenge to the evidentiary sufficiency of a state criminal conviction, the Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). A "conviction may be based upon circumstantial evidence and inferences based upon the evidence." United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993). The Court must draw "all permissible inferences" in the prosecution's favor. Dixon v. Miller, 293 F.3d 74, 81 (2d Cir. 2002). And the state court's determinations regarding witness credibility are presumed to be correct. Shabazz v. Artuz, 336 F.3d 154, 161 (2003). In short, a petitioner "bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (internal quotation marks and citation omitted).

To determine what the prosecution was required to prove at trial, the Court "must look to state law to determine the elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999). Under New York law, a person is guilty of manslaughter in the first degree when "with intent to cause serious physical injury to another person, he causes the death of such person." N.Y. Penal Law § 125.20(1). When evaluating whether the defendant possessed the requisite intent, the "defendant may be presumed to intend the natural and probable consequences of his actions, and intent may be inferred from the totality of the conduct of the accused." People v. Mahoney, 6 A.D.3d 1104, 1104 (4th Dep't 2004) (internal quotation marks and citations omitted).

To be held criminally liable for first-degree manslaughter, a person need not directly cause the death of the victim. Under New York law, "[w]hen one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with mental culpability required for the commission thereof, he . . . intentionally aids such person to engage in such conduct." N.Y. Penal Law § 20.00. "A person whose criminal liability is premised upon the conduct of another person may be held liable even though the other person is not criminally liable for the offense, or is not prosecuted for the offense." Martinez v. Breslin, 07 Civ. 8671 (DC), 2009 WL 2244633, at *5 (S.D.N.Y. July 28, 2009) (citing N.Y. Penal Law §§ 20.05(1), (2); People ex rel. Guido v. Calkins, 9 N.Y.2d 77 (1961)).

Colbert argues that the evidence did not establish that he intended to cause serious physical injury to Torres because he withdrew from the fight when he realized that Torres was no longer fighting back and because he did not wield a weapon or inflict the deadly blow. When viewing the evidence in the best light to the prosecution, a rational trier of fact could have found that the essential elements for a conviction of first-degree manslaughter were met. The evidence

15

presented to the jury included Colbert's written and video testimony that both he and Bates repeatedly punched and pushed Torres. His statements were corroborated by Ms. Jamison's testimony that she witnessed Bates repeatedly punch Torres and bang his head against the ground, while Colbert stood nearby watching by the stairway door. Ms. Jamison also testified that she continued to hear banging noises in the hallway after she ran back to her apartment to call the police, indicating that she did not witness the entire attack. Additionally, the forensic expert testified that blood found on the clothing Colbert wore on the night of the attack was a positive DNA match for Colbert, Bates and Torres.

The Appellate Division's finding was not objectively unreasonable in light of the evidence at trial and New York case law finding evidence of this nature sufficient to show that the defendant intended to cause serious physical injury to the victim. See People v. Rogers, 94 A.D.3d 1246, 1250 (3d Dep't 2012) (finding defendant intended to cause serious physical injury where he admitted to throwing the victim against the wall, there was a dent in the wall at the height of the victim's head, and the medical examiner testified that the beating resulted in the victim's death); People v. Audi, 88 A.D.3d 1070, 1072 (3d Dep't 2011) (finding defendant intended to cause serious physical injury when he repeatedly punched the victim in the head, kicked him in the ribs and chocked him); People v. Peralta, 1 A.D.3d 115, 116 (1st Dep't 2003) ("evidence . . . that defendant punched the victim in the jaw and kicked him multiple times in the chest and face as he was lying helpless on the ground after the codefendant had hit him on the head with a beer bottle, established defendant's intent to cause serious physical injury").

Even accepting, *arguendo*, Colbert's argument that he withdrew from the fight and did not inflict the fatal stab wound on the victim, there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that he was guilty of manslaughter. In Martinez v. Breslin,

the court denied the habeas petition where evidence indicated that the petitioner had initiated a chase of the victim, began the initial attack, and continued the assault after his companion began striking deadly blows against the victim's head with a flashlight. 2009 WL 2244633 at *6. The Court found that the "totality of evidence" supported a conclusion that the petitioner "knowingly participated and continued to participate even after his companion's intentions became clear, supporting the jury's conclusion that [he] shared a community of purpose with his companion." Id. (citing People v. Allah, 71 N.Y.2d 830, 832 (1988)) (internal quotation marks omitted). Similarly, a rational juror could determine that Colbert was standing in front of the stairwell door to prevent Torres from escaping his companion's assault. The "totality of evidence" is sufficient to support a finding that Colbert "shared a community of purpose" with Bates and intended to inflict serious injury upon Torres. His claim that the evidence presented at trial was insufficient to support a verdict for first-degree manslaughter should be therefore DENIED.

### C. Lesser-Included Offense Charges

Colbert claims that his due process rights were violated when the trial court refused his request to charge the lesser-included offenses of second-degree manslaughter (N.Y. Penal Law § 125.15(1)) and criminally negligent homicide (N.Y. Penal Law § 125.10). He asserts that evidence of his intoxication supports the finding that he acted recklessly or negligently regarding the risk of death. In Beck v. Alabama, the Supreme Court held that as a matter of due process, the trial court must include instructions on lesser-included offenses in a capital case, but expressly declined to extend this rule to non-capital cases. 447 U.S. 625, 638, n.14 (1980). Although some circuits have ruled that due process requires the inclusion of lesser-included offenses in all cases, the Court of Appeals for the Second Circuit has not yet decided this issue. See Jones v. Hoffman, 86 F.3d 46, 48 (2d Cir. 1996). The Court of Appeals has, however, held

that "a claimed error in failing to include a lesser-included offense instruction in a non-capital cases is not a cognizable claim in a habeas corpus proceeding." Bonilla v. Lee, 35 F. Supp. 3d 551, 569 (S.D.N.Y. 2014) (citing Jones, 86 F.3d at 48.)

Because the Supreme Court has declined to extend a defendant's due process right to include a lesser-included offense charge in a non-capital case, the Appellate Division's decision is not contrary to, and does not involve, "an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). Accordingly, this claim should be DENIED.

Indeed, the Appellate Division's ruling was not even contrary to state law. Under New York Law, a trial court may:

> submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater. If there is no reasonable view of the evidence which would support such a finding, the court may not submit such lesser offense.

CPL § 300.50(1).

As the Appellate Division found, there is "no reasonable view of the evidence that defendant was intoxicated to the point that he was unable to form the intent to cause serious physical injury," nor is there a "reasonable view of the evidence that he acted intentionally as to the attack on the decedent but negligently or recklessly as to the risk of death." Colbert, 123 A.D.3d at 513. See People v. Gaines, 83 N.Y.2d 925, 927 (1994) (finding insufficient evidence of intoxication where the defendant had failed to present evidence of the quantity, volume, or alcoholic content of his drinks, the lapse of time between their consumption and the offense, or the "specific impact of the alcohol upon his behavior or mental state"); People v. Franco, 144 A.D.2d 581, 581 (2d Dep't 1988) (finding defendant was not intoxicated when he was able to give "clear and vivid" statements to the police four days after the murder). The only evidence of

Colbert's alleged intoxication at the time of the crime was his own statement that he had been drinking liquor and beer on the day of the assault, and testimony from Ms. Jamison that when she spoke with Colbert in the early or mid-afternoon on the day of the attack, she could tell that he had been drinking. The defense did not present evidence of Colbert's level of intoxication or the impact of the alcohol upon his behavior. Furthermore, Colbert was able to recall the details of the incident to the police and the district attorney a few hours after the attack occurred. Upon these facts, there is no reasonable view of the evidence under New York law that would support a finding that Colbert was legally intoxicated at the time of the offense.

## CONCLUSION

Because Colbert's claims do not warrant habeas relief, I recommend DENYING his § 2254 petition. I further recommend that the Court decline to issue a certificate of appealability because Colbert has not made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2); Lucidore v. N.Y.S. Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:    New York, New York
          March 18, 2016

\* \* \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Valerie E. Caproni at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Caproni. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).